<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VALENTINO IANETTI, CHRISTINA SOULE, VALENTINO R. IANETTI, GABRIEL IANETTI,<br><br>Defendants. | Case No: 19-21849 (SDW) (LDW)<br><br><br>**OPINION**<br><br><br>January 7, 2021 |

**WIGENTON,** District Judge.

Before this Court is Plaintiff the Prudential Insurance Company of America's ("Prudential") Motion to Dismiss Defendant Valentino Ianetti's ("Ianetti") Counterclaims. Prudential moves to dismiss Ianetti's Counterclaims (D.E. 8) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (D.E. 12-1.)  Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1335.[1]  Venue is proper pursuant to 28 U.S.C. § 1397.  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated below, Prudential's motion is **GRANTED**.

**I.    BACKGROUND AND PROCEDURAL HISTORY**

Ianetti's wife, Pamela Ianetti ("Insured"), was covered by a Prudential group life insurance contract for term life insurance benefits.  (D.E. 12-1 at 1; D.E. 4, ¶¶ 8, 9.)  On or around January

---

[1] (*See infra*, Section II, Jurisdiction.)

31, 2003, the Insured applied for Disability Retirement.  (D.E. 12-1 at 2; D.E. 4, ¶ 10.)  The Insured named Ianetti as the beneficiary of the Group Contract and named Christina Soule ("Soule"), Valentino R. Ianetti ("V. R. Ianetti"), and Gabriel Ianetti ("Gabriel") as contingent beneficiaries of the Group Contract.  (D.E. 12-1 at 2; D.E. 4, ¶ 10.)

On December 8, 2009, Ianetti called the police in the early hours of the morning to report that his wife had been stabbed.  *State v. Ianetti*, Crim. No. A-2919-14T1, 2016 WL 3093054, *1 (N.J. Super. Ct. App. Div. June 3, 2016).  The police arrived and found the Insured stabbed and covered in blood on the floor of her home.  (*Id.* at *1; D.E. 4, ¶ 11.)  Ianetti became an immediate suspect, as he was home alone with the Insured, found with "blood on his hands," "appeared very excited," was observed to be "shaking uncontrollably," and admitted that he moved the knife that inflicted the Insured's wounds.  *See Ianetti*, 2016 WL 3093054, at *1.  During a lengthy interrogation, the police questioned Ianetti regarding the Insured's death.  (*Id.*)  Ianetti made various statements regarding his wife's death, including that he "might have done it [himself]," that he "might have been sleepwalking," and that "if no one else did it, he must have."[2]  (*Id.*)  Following the interrogation, Ianetti was charged with first degree murder.  (*Id.*; D.E. 12-1 at 4.)

The same day, a medical examiner completed an autopsy, documented forty-seven discrete stab wounds, and ruled the Insured's death a homicide.  (D.E. 4 at 11; D.E. 12-1 at 1; *Ianetti*, 2016 WL 3093054, at *2.)  On December 16, 2009, the State received a toxicology report indicating that the Insured had Oxycodone in her system at the time of her death.  (D.E. 12-1 at 7; *Ianetti*, 2016 WL 3093054, at *2.)  Although there were various conferences over the next few years, Ianetti remained incarcerated awaiting trial.  (D.E. 12-1 at 7; *Ianetti*, 2016 WL 3093054, at *2.)

---

[2] Ianetti avers that these statements, along with others identified by Prudential, are "cherry-picked," and that while he was emotional during the over-twenty-three-hour interrogation, he always "maintained his innocence."  (D.E. 20 at 5.)

2

In May 2013, Ianetti's defense counsel produced an expert report which opined that the Insured's death was a suicide, rather than a homicide. *Ianetti*, 2016 WL 3093054, at *2. The report focused on the Insured's toxicology levels, which were hypothetically high enough to blunt the Insured's pain, and described the forty-seven stab wounds as three sets of "cluster" wounds that indicated self-infliction. (D.E. 20-1 at 1-3.) The report further opined that: the stab wounds were largely "superficial ('hesitation cuts')"; they were "indicative of a suicide"; there were "no 'defensive wounds'"; and "there were 'no blood trails.'" (*Ianetti*, 2016 WL 3093054, at *2; D.E. 20-1.) The competing expert report also posited that the amount of Oxycodone in the Insured's body was "lethal" and could have acted as "insurance" that her suicide attempt would "be successful." (*Ianetti*, 2016 WL 3093054, at *2; D.E. 20-1.)

With the assistance of three experts, the State carefully reviewed the report. (*Ianetti*, 2016 WL 3093054, at *2; D.E. 12-1 at 7.) Ultimately, the prosecutor filed a motion to dismiss the indictment, concluding that because there was "a reasonable doubt" that Ianetti had not committed the crime, "it would be morally … wrong" to continue the prosecution. *See Ianetti*, 2016 WL 3093054, at *2. The case against Ianetti was dismissed without prejudice in August 2013. (*Id.*) On February 21, 2014, Ianetti filed a motion to amend the dismissal order "to indicate that the dismissal should be with prejudice." (*Id.* at *2-3.) The judge concluded there was no basis for dismissing the indictment with prejudice, and, in June 2016, the Appellate Division affirmed the trial court's decision. (*Id.* at *5-6.) The prosecution has maintained that it "never declared" that it believes Ianetti is innocent, "never declared that there was no evidence of his guilt," and "do[es] not now necessarily feel that [defendant] is, in fact, innocent of these charges." (*Id.* at *2.)

In October 2019, Ianetti notified the state of New Jersey of his intent to claim the Insured's insurance proceeds. (D.E. 4; D.E. 12-1 at 8.) On December 23, 2019, Prudential filed an

3

Interpleader Complaint. (D.E. 1.) After learning that Gabriel had previously passed away, Prudential amended the Complaint to name the Estate of Gabriel as a potential Claimant. (D.E. 4 ("FAC").) On May 13, 2020, Ianetti answered the FAC and asserted the following Counterclaims against Prudential: demand for a declaratory judgment; breach of contract; breach of "good faith and fair dealing/bad faith"; and violation of unfair trade practices statutes.[3] (D.E. 8, ¶¶ 8-13.) On June 16, 2020, Prudential moved to dismiss Ianetti's Counterclaims. (D.E. 12-1.) On June 24, 2020, Soule answered the FAC. (D.E. 14.) On July 21, 2020, Ianetti opposed Prudential's motion. (D.E. 20.) On August 10, 2020, Prudential timely filed its reply. (D.E. 24.)

## II.     JURISDICTION

Before addressing the motion to dismiss, the Court will briefly assess Section 1335's jurisdictional requirements. *See* 28 U.S.C. § 1335 ("Section 1335"). This Court acknowledges that Prudential has not formally moved for interpleader relief or filed proof of having deposited the interpleaded funds with this Court. (*See* D.E. 12-1 at 2 n.2, 6 (moving to dismiss the Counterclaims and averring that "Prudential intends to request leave to file a Motion to appoint a representative to apply to the probate court for Letters of Administration of Gabriel's Estate, to deposit … the Death Benefit," and that "Prudential is ready, willing, and hereby offers to deposit the Death Benefit, together with accrued claim interest, if any, into the Court"); *but see* D.E. 24 at 9-10 (stating that "Prudential has tendered the full amount for deposit with the Court, to be distributed to whatever person or persons is entitled to it").). Nonetheless, this Court must confirm

---

[3] Presumably in error, Ianetti's Answer lists two Count Fours: Violation of the Federal Unfair Trade Practices Act, 18 U.S.C. § 2301, and Violation of the New Jersey Unfair Trade Practices Act, N.J.S.A. 17:29B-4. (D.E. 8.)

that it can properly exert subject matter jurisdiction over this action before it considers Prudential's Motion to Dismiss.[4]  (*See* FAC, ¶ 6 (alleging jurisdiction based on 28 U.S.C. § 1335).)

Section 1335 grants original jurisdiction to the district courts and sets forth certain requirements that must be met before an interpleader action may be maintained.  *Prudential Ins. Co. of Am. v. Pinto*, Civ. No. 07-4166, 2010 WL 1752504, at *2 (D.N.J. Apr. 28, 2010); *CNA Ins. Cos. v. Waters*, 926 F.2d 247, 249 (3d Cir. 1991).  Although the stakeholder's citizenship is irrelevant for jurisdictional purposes, the statute requires diversity of citizenship between two or more adverse claimants.  *Reassure Am. Life Ins. Co. v. The Gennaro J. Perillo & Minnie Perillo Irrevocable Tr.*, Civ. No. 09-187, 2011 WL 832185, at *2 (D.N.J. Mar. 2, 2011).  Section 1335 also requires that "the amount in controversy, which is measured by the value of the stake," be at least "$500, and compels the stakeholder to deposit the money or property at issue in the court's Registry or, in the alternative, to give a bond payable to the clerk of courts in the appropriate amount."  *NYLife Distributors, Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 374 (3d Cir. 1995).  "A proper deposit or bond is a jurisdictional prerequisite to bringing an [action in] interpleader."[5]  *U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 210 (3d Cir. 1999).

---

[4] Interpleader allows a stakeholder to file suit, deposit disputed property with the Court, and withdraw from the action, leaving the competing claimants to litigate their claims between themselves.  *NYLife Distributors, Inc. v. Adherence Grp., Inc*., 72 F.3d 371, 374–75 (3d Cir. 1995).  Although "[t]here are no codified procedures or rules governing interpleader actions, [] the case law has coalesced around a few principles."  (*Id.*)  Interpleader "typically involves two steps: during the first, the district court determines whether the requirements of the statute have been met and whether the stakeholder may be relieved from liability; during the second, it actually adjudicates the defendants' adverse claims to the interpleaded fund."  (*Id.* (citations omitted).)  "The key inquiry in the first step … is 'whether the stakeholder legitimately fears multiple vexation directed against a single fund.'"  *Metro. Life Ins. Co. v. Teixeira through Sarto*, Civ. No. 16-7486, 2017 WL 3951597, at *3–4 (D.N.J. Sept. 8, 2017).  "The second stage … is ultimately resolved by the entry of a judgment in favor of the claimant who is lawfully entitled to the stake."  (*Id.*)  Here, determining the Counterclaims' validity requires an analysis that largely overlaps with the first interpleader step.  *See* 28 U.S.C. § 1335.  Thus, this Opinion necessarily speaks, in part, to Prudential's invocation of the interpleader device.  However, this Court will refrain from issuing a ruling regarding step one of interpleader until it is presented with a proper motion.

[5] In contrast to Section 1335, the District of New Jersey's Local Civil Rules "explicitly prevent such deposits without a court order."  *Wells Fargo Bank, N.A. v. Comments Sols., LLC*, Civ. No. 19-77, 2019 WL 6873257, at *1–3 (D.N.J. Dec. 17, 2019); L. Civ. R. 67.1(a)(1)(A); *United States Life Ins. Co. in City of N.Y. v. Holtzman*, 723 F. App'x 141, 145 (3d Cir. 2018) ("Under the local rules, [interpleading plaintiff] could not have deposited the funds absent a court order to do so.").

It is within this Court's discretion to choose "not to dismiss an action for lack of subject matter jurisdiction, but instead … permit Plaintiff an opportunity to perfect jurisdiction by depositing the funds at issue with the Court's Registry." *Wells Fargo*, 2019 WL 6873257, at *1-3 (denying motion to dismiss, but conditioning decision on plaintiff first depositing the disputed funds into the Court's registry); *Nw. Mut. Life Ins. Co. v. Sonia*, Civ. No. 14-03787, 2014 WL 5392059, at *2 (D.N.J. Oct. 21, 2014) (determining "that the requirements of the interpleader statute will be met once Plaintiff deposits the employee death benefit with the Clerk of the Court."). The FAC involves more than $500 in disputed funds and names claimants with diverse citizenship. (FAC, ¶¶ 2, 3 (Soule is a citizen of Pennsylvania, and Ianetti is a citizen of New Jersey); FAC, ¶ 9 (the disputed funds amount to $101,308.44).). As discussed in further detail below, Prudential also seems to make a sufficient showing that it legitimately fears multiple adverse claims. (*See* FAC; *infra* Section IV, Discussion.) Thus, Prudential appears to have met the requirements for properly invoking the interpleader device, except for the proof of deposit of the disputed funds, which it can cure.

This Court will order Prudential to deposit the disputed funds with the appropriate entity, or file proof that it has previously done so, within twenty-one (21) days of this Opinion. *See Wells Fargo Bank,* 2019 WL 6873257, at *1–3; *see also N.Y. Life Ins. Co. v. Sahani*, 730 F. App'x 45, 50 (2d Cir. 2018) (determining that, because the "the interpleader statute is 'remedial and to be liberally construed'" and the Court holds the power "to [allow a party to] cure jurisdictional defects" for reasons of economy and efficiency, "any jurisdictional defect that might have existed … was cured *nunc pro tunc* once [the stakeholder] made its deposit") (internal citations omitted). In keeping with precedent, the Court conditions its exercise of subject matter jurisdiction upon Prudential's compliance with this Opinion. (*Id.*)

### III. LEGAL STANDARD

A defendant may move to dismiss a complaint for failing to state a claim under Rule 12(b)(6). An adequate complaint must be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

In considering a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 231 (external citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009). Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief" as required by Rule 8(a)(2). (*Id.*)

In conducting its analysis, the Court may only consider the contents of the complaint. Although the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion" to one for summary judgment, *In re Rockefeller Ctr.*

*Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999), those materials are limited to those "integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal citations omitted, emphasis in original).

## IV.     DISCUSSION

At its core, Prudential's Motion to Dismiss is founded on the contention that Ianetti's Counterclaims are barred by the holding articulated in *Prudential Ins. Co. v. Hovis.* 553 F.3d 258, 266 (3d Cir. 2009) (holding that "where a stakeholder is allowed to bring an interpleader action, rather than choosing between adverse claimants, its failure to choose between the adverse claimants (rather than bringing an interpleader action) cannot itself be a breach of a legal duty") (citation omitted); *see also Lee v. W. Coast Life Ins. Co.*, 688 F.3d 1004, 1014 (9th Cir. 2012) (reiterating that although "a stakeholder whose alleged tort caused the controversy is not absolved of liability by filing an interpleader," "a disinterested stakeholder may not be subjected to liability for its failure to resolve the controversy … in one claimant's favor").  As such, Prudential asks this Court to grant its Motion, if it finds that Prudential: (1) properly invoked the interpleader device due to genuine fear of multiple adverse claims, and (2) is not at fault for the controversy at issue. (*Id.*; D.E. 24 at 1.)

Thus, this Court first considers whether the facts of this case, construed in the light most favorable to Plaintiff, support Prudential's claim that it genuinely fears multiple claims to the Insured's benefits.  (D.E. 12-1 at 1 (discussing Prudential's fear that it may be "expos[ed] … to multiple liability because [Ianetti] may be excluded as beneficiary under N.J.S.A. §§ 3B:7-1.1 *et seq*. [("Slayer Statute")]".)  New Jersey's Slayer Statute provides as follows:

> An individual who is responsible for the intentional killing of the decedent forfeits all benefits under this title with respect to the decedent's estate, including an intestate share, an elective share, an omitted spouse's, domestic partner's or child's share, exempt property and a family allowance. … The intentional killing of the

8

>> decedent: … revokes any revocable (a) disposition or appointment of property made by decedent to the killer in a governing instrument and any disposition or appointment created by law or in a governing instrument to a relative of the killer … For purposes of this chapter: (1) "governing instrument" means a governing instrument executed by the decedent; and (2) "relative of the killer" means an individual who is related to the killer by blood, adoption or affinity and who is not related to the decedent by blood or adoption or affinity.

N.J.S.A. § 3B:7-1.1.  The chapter continues with the following provision:

> A final judgment of conviction establishing responsibility for the intentional killing of the decedent is conclusive for purposes of this chapter.  *In the absence of such a conviction the court may determine by a preponderance of evidence whether the individual was responsible for the intentional killing of the decedent for purposes of this chapter.*

N.J. Stat. Ann. § 3B:7-6 (emphasis added).

Here, Prudential properly invoked the interpleader device, due to a legitimate fear of multiple liability under the Slayer Statute.  *See Principal Life Ins. Co. v. Brooks*, Civ. No. 19-00450, 2020 WL 3469080, at *2-3 (M.D. Pa. June 25, 2020) (where stakeholder learned that claimant was under investigation for possible involvement in the insured's death, it demonstrated a genuine fear of adverse claims and properly invoked interpleader); *N.Y. Life Ins. Co. v. Sahani*, 730 F. App'x 45, 50 (2d Cir. 2018) (noting that "[t]he interpleader statute identifies as claimants those who 'are claiming or may claim' entitlement to the disputed property, … and thus interpleader jurisdiction 'extends to potential, as well as actual, claims'").  Prudential makes an adequate showing that a plain, textual reading of the Slayer Statute supports a "bona fide" fear of adverse claims arising.[6]  (D.E. 12-1 at 5-6 (cogently outlining the Slayer Statute's applicability

---

[6] This Court notes that interpretations of New Jersey's Slayer Statute are scarce, and that there is some evidence (not raised by Ianetti) suggesting that Section 3B:7-6 is sometimes applied to situations of insanity, recklessness, or accident.  *See* Sara M. Gregory, *Paved with Good 'Intentions': The Latent Ambiguities in New Jersey's Slayer Statute*, 62 Rutgers L. Rev. 821, 840 (2010).  Nonetheless, this does not invalidate Prudential's fear that the Slayer Statute could result in competing claims for the Insured's benefits.  *See, e.g., Principal Life Ins. Co. v. Brooks*, Civ. No. 19-450, 2020 WL 3469080, at *3 (M.D. Pa. June 25, 2020) (interpleader was proper to resolve claims between a "possible slayer" and the "estate of the deceased"); *Matter of Estate of Karas*, 192 N.J. Super. 107, 113 (1983), *aff'd as modified*, 197 N.J. Super. 642 (App. Div. 1984); Declan J. Murray, *What Should We Do with Norman Bates? Proposing Reform to the Uniform Probate Code to Allow Inheritance in Cases of Legal Insanity*, 31 Quinnipiac Prob. L.J. 190, 206

9

despite the "absence of a conviction"); D.E. 24 at 2-3.) Conversely, Ianetti fails to cite the relevant statutes even once, let alone present a convincing argument as to why Prudential does not face a legitimate risk of multiple adverse claims under this provision.[7,8] (Compare D.E. 12-1 at 5-6 and D.E. 24 at 1 to D.E. 20.)

Further, it takes little examination of the facts to see that they could support competing, colorable claims to the benefits.[9] *See Reliastar Life Ins., Co. v. Fitzpatrick*, Civ. No. 15-1996, 2016 WL 9651766, at *5 (M.D. Pa. Sept. 29, 2016); *see also Allstate Life Ins. Co. v. Ellett,* Civ. No. 14-372, 2015 WL 500171, at *3–6 (E.D. Va. Feb. 4, 2015) (notwithstanding evidence advanced to suggest claimant "was not involved in the [Insured's] murder," the "evidence

---

(2018) (noting that "the laws of New Jersey 'generally [hold] that an acquittal of criminal or quasi-criminal charges does not have preclusionary consequences in respect to a subsequent civil action based on the same conduct'").

[7] Instead, Ianetti devotes his brief to reiterating the facts of the homicide investigation and his prosecution for the Insured's murder. To the extent that Ianetti asks this Court to assess the facts and merits of his specific claim to the Insured's benefits, this Court refuses to do so. (*See, e.g.*, D.E. 20 at 3-4 (arguing that "none of [Plaintiff's] cited cases have facts that are anywhere near similar to this matter…").) Ianetti argues that Prudential's fears regarding multiple claims due to the Slayer Statute are "factually inappropriate," because the case against him was dismissed. (D.E. 20 at 3.) Highlighting divergent facts, however, only further illustrates the difficulties facing Prudential as stakeholder: although there has been no conviction, significant doubt remains regarding the perpetration of a crime. To the extent that Plaintiff believes the facts regarding the murder trial were "cherry-picked," he has the opportunity to argue this point in a later stage of this action. (D.E. 20 at 8.) The pleadings demonstrate the existence of disputed material facts regarding the homicide case, and time is required to complete discovery and resolve them.

[8] Ianetti also argues that a probate court denied the Slayer Statute's applicability and appointed him as the Insured's estate administrator. (D.E. 20 at 4.) In his discussion of this prior "denial," Ianetti cites to a letter written by his counsel, which seems to attach some relevant probate court orders. (*Id.*) The orders' context, however, is far from clear. (*See* D.E. 20-1, Ex. C (order appointing Soule as administrator, but denying the remaining relief, with no discussion of the merits).) Without more, the existence of a prior probate order potentially ruling on the Slayer Statute, in a proceeding in which Prudential was not a party, and over which this Court did not preside, does little to counter Prudential's concerns regarding multiple liability—particularly given Ianetti's failure to cite to the order's controlling language, or provide other evidence of the ruling's preclusive nature. (*See* D.E. 20 at 4.) Moreover, it would be premature for this Court to address the merits of Ianetti's Slayer Statute arguments. (*See* D.E. 24 at 4 (noting that "Valentino's arguments as to why he was wrongfully charged are more appropriately addressed later in the case when a trier of fact determines by a preponderance of the evidence whether Valentino should be found accountable for the felonious and intentional killing of the Insured.").)

[9] "In the context of interpleader actions, courts have held that an 'insurer does not need conclusive proof that a beneficiary is a slayer to face a sufficient threat of multiple litigation to permit the filing of an interpleader; rather, it is enough that the insured died under suspicious circumstances, the investigation remains open and the primary beneficiary has not been eliminated as a suspect.'" *Reliastar Life Ins., Co. v. Fitzpatrick*, Civ. No. 15-1996, 2016 WL 9651766, at *5 (M.D. Pa. Sept. 29, 2016) (citations omitted).

associated with the Insured's death" and an "absence of evidence detailing events preceding her stabbing" put the insurance company "in a position where it legitimately fear[ed] not just potential conflicting claims, but actual, and colorable, conflicting claims").  Here, although Soule had not filed a claim for the Insured's benefits at the time that Prudential filed the Interpleader Complaint, she had previously "requested" that the Slayer Statute be applied against her father in another probate action.  (*See* D.E. 20 at 4.)  Since then, Soule has answered Prudential's FAC, potentially indicating an intent to claim the Insured's benefits if so entitled.  (D.E. 14.)

Clearly, the decision facing Prudential "of how to disburse the funds under the policy" is far from "an ordinary one."  *Principal Life Ins. Co. v. Brooks*, Civ. No. 19-450, 2020 WL 3469080, at *3 (M.D. Pa. June 25, 2020).  Although the record is only minimally developed, the evidence thus far suggests two starkly divergent paths: the Insured either died from extreme Oxycodone use, which allowed her to self-inflict forty-seven stab wounds, or was killed by Ianetti.  (*See, e.g,* D.E. 12-1 at 2-6; D.E. 20 at 5-6.)  Factually, it is also undisputed that Ianetti was at home alone with the Insured when she died, touched the weapon used to stab her, and was found with blood on his hands.  (D.E. 12-1 at 3-4.)  Therefore, "[e]ven though no other claims have been made on the insurance," potential colorable claims exist.  *See United Inv'rs Life Ins. Co. v. Grant*, Civ. No. 17-16, 2006 WL 2308286, at *2 (E.D. Cal. Aug. 9, 2006); *John Hancock Life Ins. Co. v. Schroeder*, Civ. No. 15-0648, 2015 WL 5227930, at *3 (M.D. Pa. Sept. 8, 2015).  In a case with such gruesome facts and conflicting narratives, Prudential seems entitled to invoke interpleader.

Next this Court considers whether Prudential bears any "blame for the existence of the ownership controversy," and whether Ianetti's "counterclaims are directly related to the

stakeholder's failure to resolve the underlying dispute in favor of one of the claimants."[10]  *Hovis*, 553 F.3d at 259.  Here, Prudential had no role in the creation of the controversy underlying the Interpleader Complaint.[11]  Ianetti does not allege any facts to suggest that Prudential's actions somehow decreased or damaged the funds that he is allegedly owed.  (*See* D.E. 20.)  Ianetti also does not allege that he requires discovery to unearth such facts, or that Prudential's Motion is

---

[10] Ianetti dedicates much of his briefing to disputing the applicability of *Hovis*. (*See* D.E. 20 at 6-8; 553 F.3d at 266.) Ianetti's application of the case, however, exposes a flawed understanding of both the *Hovis* holding and, more broadly, the interpleader device.

*First*, Ianetti's argument that *Hovis* is inapplicable because it does not discuss the Slayer Statute is misguided.  (D.E. 20. at 6-7.)  As discussed above, to properly invoke the interpleader statute, a stakeholder must have a legitimate fear of adverse claimants.  Prudential has presented sufficient evidence of a legitimate fear.  *See, e.g., New York Life Ins. Co. v. Ortiz*, Civ. No. 14-74 S, 2015 WL 5793701, at *7 (D.R.I. Sept. 30, 2015) (holding that a legal impediment to payment of insurance benefits exists where the potential beneficiary is a suspect to the decedent's murder).  Although these decisions are not controlling, other state and federal courts considering similar circumstances have found that "an insurance company has a duty to clothe its disbursement of the proceeds of the policy with the protection of a judicial determination."  *Monumental Life Ins. Co. v. Lyons-Neder*, 140 F. Supp. 2d 1265, 1273 (M.D. Ala. 2001) (although potential beneficiary had never been "indicted, arrested, or accused of killing" the insured, she also had not been "ruled out" as a "suspect in the homicide"); *Glass v. United States*, 506 F.2d 379, 382 (10th Cir. 1974) (noting that the VA's decision to distribute benefits to a beneficiary who had been indicted, but not yet convicted, of the insured's murder, rather than employ the "simple solution" of the interpleader device, was "erroneous").  In fact, the stakeholder's risk of potential liability is even further heightened where, as here, the beneficiary has never been ruled out as a suspect.  *See, e.g., Wilty v. Prudential Ins. Co. of Am.*, Civ. No. 18-2602, 2018 WL 7019197, at *1 (W.D. Tenn. Sept. 25, 2018).  Thus, the Slayer Statute can provide a proper basis to invoke interpleader.  Once interpleader has been properly invoked, the principles underlying *Hovis* remain the same.  553 F.3d at 266.

*Second*, despite Ianetti's protestations, by invoking the interpleader device, Prudential has not "denied" Ianetti's claim in bad faith.  (*See, e.g.,* D.E. 20 at 3 (alleging that Prudential has "den[ied] [his] application for a payout on the policy"); *id.* at 6 (alleging that Prudential has "taken the liberty of performing its own murder investigation").)  To the contrary, Plaintiff has acknowledged that it owes funds under the policy but believes that the Slayer Statute may apply to revoke Ianetti's rights to the funds.  (D.E. 24 at 4 (Prudential "takes no position as to the relative merits of defendants' potential claims …").)  After discovery and a thorough investigation, the evidence could show that Ianetti is prohibited from inheriting his deceased wife's benefits.  It is equally possible that, upon further development of the record, Ianetti will prove that he is not barred from inheriting the Insured's benefits.  "To allow Prudential to be exposed to liability under these circumstances would run counter to the very idea behind the interpleader remedy—namely, that a 'stakeholder [should] not [be] obliged at his peril to determine which claimant has the better claim.'" *Hovis*, 553 F.3d at 265.

[11] Ianetti's arguments that Prudential is somehow to blame for "causing the controversy" are misguided.  (D.E. 20 at 8 (alleging, among other things, that "Prudential [is] … causing thousands in legal bills" to Ianetti).)  "It is the general rule that a party seeking interpleader must be free from blame in causing the controversy." *Farmers Irrigating Ditch & Reservoir Co. v. Kane*, 845 F.2d 229, 232 (10th Cir. 1988) (where a stakeholder "stands as a wrongdoer … he cannot have relief by interpleader").  To have "caused" the controversy, however, the stakeholder must have taken improper actions, and through those improper actions created damages. *See Lee v. W. Coast Life Ins. Co.*, 688 F.3d 1004, 1012 (9th Cir. 2012) (allowing counterclaims that related to the stakeholder's negligence, which were "wholly separate and apart from [the stakeholder's] failure to award [] the policy proceeds").  Ianetti does not claim Prudential acted in such a manner.  (*See* D.E. 20; D.E. 8, Counterclaims, ¶ 7 (alleging variations of the sentiment that Prudential should "pay the Policy proceeds to" Ianetti).)

12

otherwise premature. (*Id.*) Nor does Ianetti's brief seem to allege any plausible facts that suggest a "bad faith" motivation, besides Prudential's legitimate concern for avoiding multiple liability. (*Id.*) In fact, Ianetti does not cite to the specific allegations in his Counterclaims even once. (*Id.*) In those allegations, Ianetti stated that he requested "the payout of the life insurance policy," was later "informed that an interpleader action had [] been filed," and then "demanded … that the litigation cease … and that the insurance policy, and all other pension benefits entitled to [him] be paid immediately." (D.E. 8, ¶¶ 1, 4, 5.) Thus, Ianetti's barebones Counterclaims seem to arise squarely from Prudential's decision to institute an Interpleader action. (*Id.*; D.E. 20 at 8-9 (discussing Prudential's "indifference" towards Ianetti, and Ianetti's concerns regarding legal fees).) Each claim alleges that Prudential is at fault for filing the Interpleader Complaint, rather than paying Ianetti the disputed benefits. (*See* D.E. 8, Counts 1-4 (demanding a "declaratory judgment" that he is entitled to the Insured's benefits; alleging that Prudential breached its contract by "failing to honor … its contractual obligations" to pay him those benefits; alleging that Prudential breached the covenant of good faith and fair dealing by "refusing, without reasonable basis, to provide" him with the benefits; and alleging that Prudential violated unfair trade practices statutes by "denying Defendant's claim" to the benefits).) It is logically impossible to separate these Counterclaims from Prudential's decision to invoke the interpleader device.

Considering only the pleadings for purposes of this Motion, this Court finds that Prudential is entitled to dismissal of Ianetti's Counterclaims for failure to state a claim. Prudential appears to have properly invoked its right to invoke the interpleader device. As Ianetti's Counterclaims arise squarely from Prudential's decision to seek interpleader, they fail to state a plausible claim showing he is entitled to relief.[12]

---

[12] Prudential also argues that, in addition to being entitled to "dismissal as interpleading stakeholder," it is entitled to dismissal because Ianetti's claims do not "state [] valid cause[s] of action." (D.E. 12-1 at 16-17.) Ianetti does not

13

## V. CONCLUSION

For the reasons set forth above, Prudential's Motion to Dismiss is **GRANTED**. An appropriate Order follows.

s/ *Susan D. Wigenton*  
**SUSAN D. WIGENTON**  
**UNITED STATES DISTRICT JUDGE**

Orig:   Clerk  
cc:    Leda D. Wettre, U.S.M.J.  
     Parties

---

seem to respond, beyond stating generally that "[a]ny claims of bad faith and prejudice" exist as "separate and distinct from Prudential's decision to sue the slayer statute." (*See* D.E. 20 at 2.) Thus, if *Hovis* did not act to bar Ianetti's Counterclaims, his failure to make out the *prima facie* elements of his counts would likely act as a stand-alone basis for their dismissal.